UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Marcel Koszkul,<br><br>Plaintiff,<br><br>v<br><br>Michelle Carney,<br><br>Defendant | 24-cv-06480-EAW<br><br>Hon. Elizabeth A. Wolford<br><br>**THIRD-PARTY COMPLAINT** |
| Michelle Carney,<br><br>Third Party Plaintiff,<br><br>v<br><br>Rochester Institute of Technology,<br><br>Third Party Defendant. | |

1. Third-party plaintiff Michelle Carney, (hereinafter "Ms. Carney") by and through her attorneys, J. Morgan Levy Firm, PLLC, by way of this Third-Party Complaint against third-party defendant Rochester Institute of Technology (hereinafter "RIT").

## NATURE OF THE ACTION

2. Ms. Carney brings this action in connection with plaintiff Marcel Koszkul's suit against her for defamation.

3. Ms. Carney made a report to third party defendant RIT alleging she was sexually harassed by Mr. Koszkul.

4. Third party defendant RIT failed to adjudicate her allegations in a manner consistent with its obligations pursuant to state and federal laws, and its own policies.

5. Third party defendant RIT subsequently found Mr. Koszkul "not responsible" for violating its policies and articulated its findings in an outcome letter sent to both Mr. Koszkul and Ms. Carney.

1

6.  Subsequently, Mr. Koszkul brought this action against Ms. Carney for defamation.  In his complaint, the words Mr. Koszkul cited as defamatory were not Ms. Carney's words, but rather RIT's.

7.  As a result of the foregoing, pursuant to Rule 14(a)(1) Ms. Carney interpleads RIT into this matter bringing claims of common law indemnity and contribution.

8.  Ms. Carney also brings additional claims against RIT for breach of contract, negligence and negligent supervision pursuant to Fed. R. Civ. Pro. 18.

9.  Ms. Carney brings this third party claim for the purpose of accomplishing in one proceeding the adjudication of the rights of all persons concerned in the controversy and to prevent the necessity of trying several related claims in different lawsuits.

## PARTIES

10. Ms. Carney, defendant/third party plaintiff is a resident of New York State.

11. Upon information and belief, plaintiff Mr. Koszkul, is a resident of Connecticut.

12. RIT, third party defendant, is a non-profit educational institution whose primary place of business is in Henrietta, county of Monroe, state of New York.

13. Ms. Carney was enrolled at RIT from 2020 to 2024.

14. Upon information and belief Mr. Koszkul was enrolled at RIT from 2017 until May 13, 2022.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because plaintiff is a citizen of Connecticut and RIT and Ms. Carney are citizens of New York and because plaintiff has asserted the matter in controversy exceeds $75,000.

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because RIT's primary place of business is in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL BACKGROUND

17. RIT is a private post-secondary school.

18. RIT is an educational institution as defined in 20 USCS §1681(c) and a "postsecondary institution" as defined by 34 CFR § 106.30(b).

19. RIT is obligated by state and federal laws to prevent and respond to allegation of sexual harassment.

20. RIT is a recipient of federal funds and is therefore subject to Title IX of the Education Amendments of 1972, as amended ("Title IX") and its implementing regulations ("Title IX Regulations").

21. RIT is subject to the requirements of the Violence Against Women Act's ("VAWA") amendments to the Clery Act.

22. RIT is subject to the requirements of New York State Education Law Article 129-B.

23. In connection with these obligations, RIT has established a Title IX policy, "C27.0 Policy on Title IX Sexual Harassment for Faculty, Staff, and Students" (hereinafter, "RIT's Title IX Policy") and a Sexual Misconduct policy "Policy D19.0 Sexual Assault: Non-Consensual Sexual Contact" (hereinafter "Sexual Misconduct Policy"). *See* Exhibit 1 for a copy of these policies.

**Training for Investigators and Decision Makers**

24. Because adjudicating allegations of sexual harassment requires special knowledge and skills, various laws recognize the need to require educational institutions, like RIT to provide all decision makers training to do so.

25. The Violence Against Women Act's amendments to the Clery Act requires RIT's procedures for institutional disciplinary action in cases of alleged dating violence, domestic violence, sexual assault, or stalking be conducted by officials who, at a minimum, receive annual training on the issues related to dating violence, domestic violence, sexual assault, and stalking and on how to conduct an investigation and hearing process that protects the safety of victims and promotes accountability.

26. In addition, Article 129-B gives all students the right to "have complaint[s] investigated and adjudicated [. . .] by individuals who receive annual training in conducting investigations of sexual violence, the effects of trauma, impartiality [. . .]."

27. Similarly, the regulations require Title IX Coordinators, investigators, decision-makers, and any person who facilitates an informal resolution process, receive training on (1) the definition of sexual harassment in § 106.30 [. . .] (2) how to conduct an investigation and grievance process including hearings, appeals, and informal resolution processes, as applicable, (3) how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias, (4) ensure materials used to train Title IX Coordinators, investigators, decisionmakers, and any person who facilitates an informal resolution process, do not rely on sex stereotypes, and promote impartial investigations and adjudications of formal complaints of sexual harassment, (5) train both decision-makers and investigators on issues of relevance, including how to apply the "rape shield"

protections provided to complainants, and (6) make training materials publicly available on its website.

28. The regulations also dictate materials used to train Title IX Coordinators, investigators, decision-makers, and any person who facilitates an informal resolution process, must not rely on sex stereotypes, and must promote impartial investigations and adjudications of formal complaints of sexual harassment.

29. The training materials third party defendant RIT had posted on its website at times relevant to this complaint in compliance with the Title IX regulations obligations are dated "2020" prior to any of the individuals who served as decision makers in third party defendant RIT's adjudication of Ms. Carney's complaint being employed by third party defendant RIT.  *See* Exhibit 2.

30. Section XIV of RIT's Title IX Policy, entitled "Training Requirements" commits to train "individuals involved in investigations, hearings, or appeals under [the Title IX Policy]" as required in paras. 24-28 above.

31. Upon information and belief, third party defendant RIT has not provided annual training as required by VAWA and New York State Education Law.

32. Pursuant to the obligations imposed on it by New York State Education Law Article 129-B all students at RIT have the right to have a complaint investigated and adjudicated by individuals who receive annual training in conducting investigations of sexual violence, the effects of trauma, and impartiality.

**Timeliness**

33. Pursuant to the obligations imposed on it by New York State Education Law Article 129-B all students at RIT have the right to have a complaint investigated and adjudicated in an impartial, timely, and thorough manner.

34. Similarly, the Title IX Regulations call for institutions to provide reasonably prompt time frames for conclusion of the grievance process, and one that allows for the temporary delay "with written notice to the complainant and the respondent of the delay or extension and the reasons for the action."

**Procedural Obligations**

35. Pursuant to its Title IX obligations in response to a formal complaint of Title IX sexual harassment RIT must conduct a grievance procedure consistent with the Title IX regulations and as outlined in 34 CFR 106.45 et seq.

36. In its Notice of Investigation and Allegations, RIT promised to Ms. Carney a right to privacy in its investigation and adjudication of her complaint of sexual harassment stating, "This investigation is ongoing and RIT will take all reasonable measures to protect your privacy and the integrity of the investigation."  *See* Exhibit 3.

37. RIT's Title IX Policy defines privacy as "Privacy" means that information related to an incident or report will be shared only with a limited circle of individuals who "need to know" in order to assist in the active review, investigation, or resolution of the report. While not bound by confidentiality, individuals with whom a report is shared will be discreet and respect the privacy of all individuals involved in the process." Title IX Policy, section VII (M).

38. Consistent with its legal obligations, section IX (E) (6) (c) of RIT's Title IX Policy states that at the conclusion of a hearing held in response to a formal complaint of Title IX sexual harassment RIT will provide to the parties, a written determination of the hearing board's decision.  The written determination must include:

      a.      Findings of fact supporting the determination;

      b.      Conclusions regarding the application of the recipient's code of conduct to the facts;

      c.      A statement of, and rationale for, the result as to each allegation, including a determination regarding responsibility

39. The definition of "rape" contained in RIT's Title IX Policy is not the same as the definition of "rape" under New York State criminal law.

<u>Ms. Carney's Title IX Complaint</u>

40. RIT encourages its students to report potential violations of is policies, including its Title IX Policy.

41. On July 29, 2022, Ms. Carney reported Mr. Koszkul's sexually assaulting her to RIT.

42. Ms. Carney subsequently filed a Formal Complaint of Title IX sexual harassment to RIT's Title IX Coordinator on August 22, 2022.

43. The Formal Complaint document stated Ms. Carney was too intoxicated to consent to sexual activity on two occasions and, "I wish for an investigation to take place into the allegations I have provided."

44. A copy of this Formal Complaint is included at Exhibit 4.

45. Ms. Carney received a Notice of Investigation and Allegations on August 22, 2022.

46. This Notice of Investigation and Allegations contained statements not reflected in Ms. Carney's Formal Complaint.  *See* Exhibit 3.

47. On August 31, 2022 Ms. Carney received an "Ammended [sic] Notie [sic] of Investigation and Allegations" which stated it "reflected the charges of all three alleged incidents given the varying locations."

48. A copy of this "Ammended [sic] Notie [sic] of Investigation and Allegations" is included at Exhibit 5.

49. This "Ammended [sic] Notie [sic] of Investigation and Allegations" also contained statements not reflected in Ms. Carney's Formal Complaint.

50. Ms. Carney later learned this "Ammended [sic] Notie [sic] of Investigation and Allegations" was sent to another RIT student by mistake.

51. Ms. Carney only learned about RIT's mistake because the student who received the letter approached her to tell her that she had received and read it.

52. Only after Ms. Carney told RIT staff that she was aware her privacy had been violated did RIT respond acknowledging its mistake.  No apology was made.

53. A copy of RIT's letter acknowledging its violation of Ms. Carney's privacy and disclosure of the "Ammended [sic] Notie [sic] of Investigation and Allegations" to an unrelated third party is included at Exhibit 6.

54. RIT investigated Ms. Carney's Formal Complaint and RIT shared a completed a Final Investigation Report to the RIT's Center for Student Conduct and Conflict Resolution ("CSCCR") on February 17, 2023.

55. A copy of this Final Investigation Report is included at Exhibit 7.

56. Thirty-two days later, on March 21, 2023, RIT's CSCCR notified Ms. Carney it would be proceeding with its administrative hearing process and a hearing would be scheduled to determine whether Mr. Koszkul violated RIT policies.

57. A copy of this March 21, 2023 letter (hereinafter "the Charge Letter") is included at Exhibit 8.

58. The Charge Letter referenced three (3) encounters; one on August 28, 2021, one occurring sometime between September 4, 2021 and September 11, 2021 and another in "early to mid-October" 2021.

59. The Charge Letter indicated Mr. Koszkul may have also violated third party defendant RIT's Student Conduct Process Policy "D18.0" and RIT's Alcohol, Cannabis, and Other Drugs Policy "D18.1", but failed to describe those policies or why Mr. Koszkul may have violated them.

60. The Written Determination Letter provided to the parties at the end of the adjudication process made no reference to D18 or D18.1.

61. RIT failed to include as potential violations references to policies which would be used to address Ms. Carney's report Mr. Koszkul failed to use a condom while having sex with her, despite her complaining of this in the investigation.

62. RIT failed to include as potential violations of policies those which would address Mr. Koszkul allegation that he and Ms. Carney were in a romantic relationship at the time of the alleged sexual harassment.

63. The Charge Letter also purported to disclose the identity of the decision makers assigned to the hearing board for the case; two CSCCR administrators. *See* Exhibit 8, pg. 4.

64. RIT failed to notify Ms. Carney of the identity of a third decision maker, an attorney who appeared at the hearing as a member of the hearing board, engaged in questioning of the parties, and who, upon information and belief, wrote the final Written Determination Letter for the hearing board.

<u>The Hearing</u>

65. RIT held its hearing on April 19, 2023, twenty-nine (29) days after its hearing notice was sent to Ms. Carney.

66. Upon information and belief, Mr. Jarron Mortimer, Director, Center for Student Conduct and Conflict Resolution, oversaw the hearing.

67. According to the director CSCCR job description (included as Exhibit 9 to this complaint) as director, Mr. Mortimer serves "as chief conduct officer for the university"; must "be prepared to address complex areas including gender based and sexual misconduct…"; and "is responsible for administering the student conduct process in a manner that ensures student development, consistent and fair application of University policy, and respectful treatment of all participants."

68. This hearing was conducted in a manner seemingly designed to create a stressful environment.

69. Despite the Charge Letter assuring Ms. Carney she could utilize a privacy screen during the hearing to prevent her from viewing Mr. Kozskul, the hearing board failed to offer her one.  *See* Exhibit 8, pg. 2.

70. The hearing board required Ms. Carney be seated at the head of the table, away from her advisor, and forcing her to look directly at Mr. Kozskul throughout the hearing.

71. The hearing commenced at 3:15PM and did not end until 10:30PM.

72. Because of the late hour a critical witness, a Campus Safety Investigator, was unavailable for the entirety of the hearing, and unable to provide clarification on important factual issues.

73. The hearing board did not allow for a dinner break.

74. The hearing board refused to allow the parties to get water (available immediately outside of the room) when asked.

75. The hearing board refused to allow Ms. Carney to speak with her advisor for more than two minutes at a time when Ms. Carney requested a break.

76. The hearing board permitted Mr. Kozskul's advisor to subject Ms. Carney to repeated, irrelevant questions.

77. Because of the late hour, when the hearing finally ended Ms. Carney was unable to connect with support systems, including her RIT CARES advocate and her therapist.

78. During the hearing the attorney member of the hearing board and RIT's Title IX Coordinator seemed distracted and not fully engaged as they were repeatedly looking at their phones and/or Apple watches.

<u>Written Determination</u>

79. On May 5, 2023, Ms. Carney received a Written Determination Letter from the hearing board finding Mr. Koszkul not responsible for any violations RIT policy.

80. A copy of this Written Determination Letter is included at Exhibit 10.

81. In delivering this letter more than 15 days after the hearing concluded, RIT violated its own Title IX Policy which dictates: "Within ten (10) days of the completion of the hearing, the hearing officers will issue a written Outcome Letter which will be provided

to both parties simultaneously and, in the case of students, in person when possible." *See* Exhibit 1, Title IX Policy section IX (E) (6) (c).

82. No explanation for the delay in the process was provided, despite third party defendant RIT's obligation to notify parties of delays pursuant to federal law.

83. According to the Title IX regulations and RIT's Title IX Policy (*see* Title IX Policy Section IX (E)(6)(c)) a Written Determination Letter following a hearing must include:

   a.    Findings of fact supporting its determination of responsibility;

   b.    Conclusions regarding which section of the RIT Title Policy the respondent has or has not violated;

   c.    A statement of, and rationale for, a determination regarding responsibility.

84. The Written Determination Letter revealed the hearing board evaluated not three (3) encounters, as the Charge Letter articulated it would, but nine (9) encounters.

85. Regarding those nine encounters, the Written Determination Letter failed to include findings of fact as required by the Title IX Policy.

86. For each encounter the hearing board evaluated, rather than articulating the facts found to be true, the Written Determination Letter merely described the alleged encounter and stated the hearing board determined Ms. Carney was "not credible".

87. The Written Determination Letter failed to include conclusions regarding the application of the recipient's code of conduct to the facts as required by the Title IX Policy.

88. Because the Written Determination Letter includes no finding of facts it could not, and did not, apply RIT's code of conduct to those facts.

89. The Written Determination Letter provides no indication the hearing board consulted or reviewed RIT policies, at all, in coming to its conclusion.

90. The Written Determination Letter fails to include a statement of, and rationale for, the result as to each allegation as required by the Title IX Policy.

91. The Written Determination Letter is also logically inconsistent.

92. In example, in its determination regarding the September 11 event the Written Determination Letter described the hearing board's conclusion Ms. Carney was not too intoxicated to consent to sexual activity citing Ms. Carney's commenting "I'm too drunk for this" as evidence Ms. Carney was not, in fact, too drunk to consent to sexual activity.

93. To make any sense, at all, of this conclusion one must assume the hearing board believed Ms. Carney made the statement "I'm too drunk for this" instead of believing Mr. Koszkul's account of the conversation which was as follows:

> Ms. Carney stated:     "Should we do this?"
> Mr. Koszkul:    "I'm fine with it if your fine with it."
> Ms. Carney:    "You've been drinking."
> Mr. Koszkul:    "It's fine that I've been drinking."
> Ms. Carney:    "We probably shouldn't then."
> Mr. Koszkul:     "Then we won't if you don't want to."

> *See* Exhibit 7, pg. 113.

94. Despite its believing Ms. Carney's account over Mr. Koszkul's account of this exchange, the hearing board ultimately states in the Written Determination Letter that Ms. Carney's "testimony about what occurred that evening was not credible." *See* Exhibit 10, pg. 4.

95. The hearing board's "rationale" for the October 30, 2021 event is similarly illogical.

96. In the Written Determination Letter's remarks regarding the October 30, 2021 event, the hearing board found "a 'kiss' occurred, but also found [Mr. Koszkul] did not engage in intentional sexual touching." *See* Exhibit 10, pg. 6.

97. Mr. Koszkul denied he kissed Ms. Carney at all on October 30, 2021, (Exhibit 7, pg. 26) yet the hearing board found this kiss occurred, seeming to indicate they found Mr. Koszkul's account (that no kiss occurred) not to be credible.

98. The hearing board, however, finds the opposite, stating "[Ms. Carney]'s testimony regarding this contact was not found to be credible."  *See* Exhibit 10, pg. 6.

99. The Written Determination Letter evidences the hearing board's inferring responsibility from Ms. Carney's declining to answer questions in violation its obligations under the Title IX regulations and its own Title IX Policy.

100.     The Written Determination Letter also evidences the hearing board's

    a)     failure to consider inculpatory evidence.

    b)     decision to ignore relevant, substantive evidence.

    c)     failure to comprehend the definition of consent RIT is required by law to use.

    d)     adoption and use of sex stereotypes in its decision making.

101.     The Title IX regulations obligate recipients to require "any individual designated by a recipient as a Title IX Coordinator, investigator, decision-maker, or any person designated by a recipient to facilitate an informal resolution process, not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent."  34 CFR § 106.45.

102.     The Title IX regulations also prohibit reliance on sex-role stereotypes in Title IX adjudications.

103.     RIT's Written Determination Letter is egregiously biased against Ms. Carney as a complainant, lacks rationale to support the findings, refuses to consider relevant

evidence, and is rampant with sex-role stereotyped, victim-blaming language regarding Ms. Carney. *See* Exhibit 10, generally.

104.     In example in the Written Determination Letter states, "[Ms. Carney] claims she felt pressured to have [Mr. Koszkul] over at her house that evening despite her claim that you sexually assaulted her on seven separate occasions prior to this meeting." *See* Exhibit 10, pgs. 5-6.

105.     This sentence clearly evidences a gross lack of understanding about dating and domestic violence.

106.     Another sentence declares, "The Complainant [Ms. Carney] alleges that after you sexually assaulted her on two prior occasions, she left the safety of her home to go to your house."

107.     The language in paras. 104 and 106 also indicate the presence of sex-role stereotyping, prohibited by the regulations.

108.     Overall, the Written Determination Letter reveals the hearing board "subscribe[d] to the pernicious view that women who file sexual harassment and gender-based violence complaints are liars." *Smith v RB Distrib., Inc.*, 498 F Supp 3d 645, 656 [ED Pa 2020])*; quoting* Deborah Tuerkheimer, *Incredible Women: Sexual Violence and the Credibility Discount*, 166 U. Pa. L. Rev. 1, 9 (2017) (describing "recurring tropes" of disbelief accompanying female rape victims, namely that "the rape accuser is malicious or vindictive and therefore lying about her rape; she is regretful about consenting to sexual activity with the accused and therefore lying about her rape; or she is incapable of assessing whether she consented due to intoxication, and therefore lying when she claims otherwise").

109.    We can only presume this annual training has not been done for the third party defendant RIT decision makers in this case because not only is it not posted on the website as required by the Title IX regulations but also because the hearing board apparently failed to understand the definition of consent, which is necessary to understand the definition of sexual harassment (see above for further discussion).

110.    While Ms. Carney followed third party defendant RIT's guidance on keeping the matter private, Mr. Koszkul did not.

111.    In May 2023, Mr. Koszkul shared, on both Instagram and a group chat with the men's rowing team, a full copy of RIT's incredibly insensitive, illogical, and sexist Written Determination Letter.  A true and accurate copy of Mr. Koszkul's sharing this letter is included at Exhibit 11 to this complaint.

112.    Ms. Carney was unsurprised Mr. Koszkul published the outcome letter, as she had made clear during the investigation she was intimidated by Mr. Koszkul and worried about he would attempt to tarnish her reputation amongst their teammates.

113.    Although Mr. Koszkul personally shared RIT's words, the very words he now alleges were defamatory, publicly on social media, he subsequently brought a defamation suit against Ms. Carney.

## Appeal

114.    RIT's Written Determination Letter provided Ms. Carney and Mr. Koszkul the opportunity to submit an appeal of the decision by no later than May 15, 2023.

115.    Upon information and belief, Mr. Kozskul graduated from RIT on May 13, 2023.

116.    Upon information and belief, Mr. Kozskul's graduation officially ended Mr. Kozskul's relationship with the university.

117.     Upon information and belief, after May 13, 2023, third party defendant RIT was unable to subject Mr. Kozskul to discipline pursuant to its policies.

118.     If the hearing board had sent its Written Determination Letter two days sooner, Mr. Kozskul would have remained subject to third party defendant RIT's policies at the time Ms. Carney appealed.

119.     Ms. Carney timely submitted an appeal of the hearing board's decision.

120.     A copy of Ms. Carney's appeal request is included at Exhibit 12.

121.     Ms. Carney appealed on one of the three eligible grounds third party defendant RIT allows under its C27 Policy; that "procedural irregularity [occurred] that affected the outcome of the matter". *See* Exhibit 12.

122.     Ms. Carney's appeal also objected to the prolonged investigation, followed by an additional two-months prior to the hearing and the violation of her privacy as discussed above in paras. 36, 37, 50-3. *See* Exhibit 12.

123.     Given Mr. Kozskul was scheduled to graduate from third party defendant RIT on May 13, 2023, this two-month period between when CSCCR received the final investigation report (February 17, 2023) and when the hearing was held (March 21, 2023) was particularly unreasonable.

124.     In her appeal, Ms. Carney also noted that members of the hearing board were not fully engaged in the hearing as more fully described above in para. 78. *See* Exhibit 12.

125.     Ms. Carney's appeal also highlighted a significant procedural error - that she was presumed 'not credible' because she declined to answer a question.  This finding related to Ms. Carney's credibility is directly inapposite the Title IX Policy which states "The hearing officers will not draw an inference about the determination regarding

responsibility based solely on a party's or witness's absence from the live hearing or refusal to answer cross-examination or other questions."  *See* Title IX Policy IX (E)(6)(6).

126.    Despite her two-page, single-spaced, testament of describing procedural irregularities she endured during this process and her plea for an appeal to review them, seven days later, on May 22, 2023, Associate Vice President, Student Affairs, Dr. Nicole Boulais, rejected Ms. Carney's appeal.  *See* Exhibit 13.

127.    Ms. Carney, a college-student assaulted by a fellow student, reported her assaults to her Title IX Coordinator, as directed to her by third party defendant RIT, resulting in a year-long investigation, followed by a seven-hour hearing where she was not allowed dinner or water, ending with an outcome letter riddled with victim-blaming, sexist language, offering a false appeal deadline after her accuser graduated, and then denying the appeal.

## AS FOR A FIRST CAUSE
### Breach of Contract

128.    Third party plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

129.    Upon RIT's acceptance of third party plaintiff for admission, third party plaintiff and RIT were parties to a contract in which plaintiff paid tuition to RIT and in exchange for RIT's promise to provide a safe environment on which third party plaintiff could obtain her education.

130.    The terms of this contract are included, in part, within RIT's policies including its Student Conduct Process and RIT's Title IX Policy.

131.    Third party plaintiff performed her obligations under the contract.

132.    Third party plaintiff relied upon RIT's promises in this contract when she accepted admission to RIT and agreed to obtain her college education there.

133.    As more fully described above third party defendant RIT failed to fulfill its obligations under this contract.

134.    Third party defendant RIT's breach was egregious.

135.    In breaching this contract third party defendant RIT did not act in good faith in its dealings with third party plaintiff.

136.    Third party defendant RIT's actions, conduct, and omissions proximately caused third party plaintiff to suffer damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

137.    Plaintiff is therefore entitled to monetary damages, punitive or exemplary damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## AS FOR A SECOND CAUSE
## Common Law Indemnification

138.    Third party plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

139.    Third party defendant RIT owed a duty to third party plaintiff to respond to allegations of sexual misconduct in a manner consistent with its own policies and law.

140.    Third party defendant RIT also owned a duty to third party plaintiff to act towards her in good faith.

141.    As more fully described above, third party defendant RIT breached these duties when it mishandled its response to third party plaintiff's report of sexual misconduct.

142.    As a result of third party defendant's breach, third party plaintiff has been sued for defamation by plaintiff.

143.    The alleged defamatory words cited in plaintiff's amended complaint as defamatory are not defendant/third party plaintiff's words, but rather third party defendant RIT's words.

144.    Should defendant/third party plaintiff be held liable for defamation, third party defendant is liable to it and must indemnify her for any damages assessed.

### AS FOR A THIRD CAUSE
### Negligent Supervision

145.    Defendant/third-party plaintiff incorporates by reference the allegations contained in paragraphs 1 through 144 as if fully set forth herein.

146.    Third party defendant owed a duty of care to third party plaintiff to ensure that its employees with decision making authority over allegations of Title IX violations had the necessary expertise and training.

147.    Third party defendant failed to exercise reasonable supervision in hiring its Director for Student Conduct, who oversaw the adjudication of those claims related to plaintiff's amended complaint.

148.    Third party defendant breached this duty by failing to properly supervise and ensure that Director for Student Conduct conducting the Title IX hearing had the requisite expertise required for the position.

149.    As more fully described above, the Director for Student Conduct lacked the necessary expertise to conduct a Title IX.

150.    The Director's lack of expertise directly and proximately caused the flawed and biased hearing process and outrageously biased outcome letter.

151.      As a direct and proximate result of third party defendant's negligent supervision, third party plaintiff has suffered economic and non-economic damages, including but not limited to, loss of income, a loss of educational opportunities, medical costs, severe emotional distress, psychological injury, mental anguish, degradation, and embarrassment.

152.      Third party plaintiff is entitled to economic and non-economic damages in an amount to be determined at trial, plus pre-judgment interest and attorneys' fees and costs.

## AS FOR A FOURTH CAUSE
### Negligence

153.      Defendant/third-party plaintiff incorporates by reference the allegations contained in paragraphs 1 through 153 as if fully set forth herein.

154.      Third-party defendant RIT took affirmative steps to supervise and control its students' reporting sexual harassment through its articulation of policies regarding the same published in its policies and disseminated to third party plaintiff.

155.      These promises made by third-party defendant RIT to its students through its policies created a special duty third-party defendant RIT owed to its students, including defendant/third party plaintiff.

156.      At the time defendant/third party plaintiff reported sexual misconduct to third-party defendant RIT the relationship between third-party defendant RIT and defendant/third party plaintiff was no longer identical to third-party defendant RIT's relationships with all students; instead, third-party defendant RIT owed plaintiff a special duty to respond to their reports of harassment with the appropriate standard of care.

157.      Third-party defendant RIT owed a duty of care to defendant/third-party plaintiff to conduct a fair and impartial investigation and disciplinary proceeding.

158.     Third-party defendant RIT breached the duty it owed to third party plaintiff when it failed to appropriately respond to plaintiff's reports of sexual harassment as more fully described above.

159.     Third-party defendant RIT's acts and/or omissions proximately caused third party plaintiff to suffer economic and non-economic damages including but not limited to a loss of educational opportunities, tuition fees, medical costs, severe emotional distress, psychological injury, and mental anguish, degradation, and embarrassment.

160.     Third party plaintiff is entitled to economic and non-economic damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Defendant/Third-Party Plaintiff respectfully requests that this Court enter judgment in favor of Defendant/Third-Party Plaintiff and against Third-Party Defendant for:

A. Compensatory damages in an amount to be determined at trial;
B. Punitive damages;
C. Attorneys' fees and costs;
D. Any other relief that the Court deems just and proper.

Date:   Rochester, New York                     J. MORGAN LEVY FIRM, PLLC
        December 17, 2024

                                                 */s/ J. Morgan Levy, Esq.*
                                                 J. Morgan Levy, Esq.
                                                 24 N. Main Street, Ste. 2
                                                 Fairport, NY, 1440
                                                 E: morgan@jmorganlevyfirm.com
                                                 P: 585-678-1179